UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>and<br><br>HOUSING OPPORTUNTIES MADE EQUAL, INC.<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>JOHN KLOSTERMAN and SUSAN KLOSTERMAN,<br><br>Defendants. | CASE NO.: 1:18CV194 |

**MOTION TO ENFORCE THE CONSENT DECREE**

**I.      INTRODUCTION**

On October 1, 2020, this Court entered a Consent Decree ("Decree") to enjoin and remedy John Klosterman's pattern or practice of sexually harassing tenants at his residential rental properties. Decree, ECF No. 92. As explained in more detail below, since that date, Defendants have violated the Decree repeatedly, often by Defendant John Klosterman's own admission. Specifically, among other things: Defendants misrepresented their ownership of rental properties in the Decree, John Klosterman continues to personally manage rental properties and communicate with tenants and prospective tenants, Defendants failed to retain an Independent Manager to manage their properties, Defendants and their agents have not completed Fair Housing Act training, and Defendants have not provided proof that they have

deposited $10,000 in monetary damages into an escrow account. Because the United States' repeated efforts to obtain Defendants' compliance have been unsuccessful, the United States now moves the Court to enforce the Decree and award other appropriate relief.

## II. BACKGROUND

The Decree: (1) requires Defendants to accurately represent and update the extent of their rental property holdings; (2) prohibits Defendant John Klosterman from continuing to personally interact with tenants or otherwise participate in the rental management business; (3) requires Defendants to turn over the management of any rental properties they own outside of the receivership created as a result of a lawsuit filed by the City of Cincinnati ("the Receivership")[1] or later acquire to an independent property manager ("Independent Manager"); (4) requires Defendants and their agents to obtain fair housing training and that Defendants ensure the adoption and implementation of a sexual harassment policy at their properties; and (5) requires Defendants pay $177,500 in monetary damages and civil penalties. Decree, ECF No. 92, at ¶¶11-39, PageID 4980-86. As explained in more detail below, Defendants failed to fully comply with any of these provisions.

Defendants' violations of the Decree are particularly egregious given that John Klosterman's harassment of female tenants continued long after the United States filed its lawsuit and even after this Court entered the Decree. On September 17, 2020, the State of Ohio

---

[1] On August 14, 2019, the City of Cincinnati filed a complaint in the Court of Common Pleas to collect fees, fines, and other costs related to extensive violations of the Cincinnati Municipal Code and subsequent code enforcement efforts at rental properties owned by Defendants. *City of Cincinnati v. John Klosterman, et al.*, Case No. A1905588. On February 14, 2020, the court placed a number of the specified properties under the Receivership. *Id.*, Order Appointing Receiver. Although Defendants represented to the United States at the time of the settlement that they had no rental properties outside of the Receivership, in fact five of their rental properties were at the time and still remain outside of the Receivership, properties which are subject to the provisions of this Decree. *See infra* at 4-5.

Except for one document noted below, the United States has not attached copies of state court filings cited in this Motion, in an effort not to burden the Court or parties with voluminous exhibits. If the Court or parties wish to receive copies of any additional state court filings, however, the United States will promptly provide such copies.

filed a Menacing by Stalking charge against John Klosterman, based on allegations that he "showed up at [the victim's] residence unannounced and uninvited, likewise he has come to her place of employment unannounced and uninvited. . .. [and] followed her in his car," *Ohio v. Klosterman*, Case No. 20CRB17905, Affidavit, Sept. 17, 2020, and said "odd things to her." *Id.*, Complaint, Sept. 17, 2020. The victim was, until at least around April 2021, a tenant in one of Defendants' properties that is outside of the Receivership but for which John Klosterman has not retained an Independent Manger. On November 5, 2020, the State filed a second Menacing by Stalking charge based on allegations that, on November 2, 2020, a month after this Court entered the Decree and with regard to the same female tenant, John Klosterman "continued to show up at the victim's employment causing her to be in fear for her safety." *Ohio v. Klosterman*, Case No. 20CRB21168, Complaint, Nov. 2, 2020.

Additionally, on at least four separate occasions, John Klosterman violated the conditions of his bond that issued as a result of the Menacing by Stalking charges described above by interacting with—and in one instance attempting to evict—the victim. On October 2, 2020, the day after this Court entered the Decree, a Municipal Judge revoked John Klosterman's bond after finding that he violated its terms by contacting the victim by text message. *See Ohio v. Klosterman*, Case No. 20 CRB 17905, Judge's Sheet, Journal Entry – Mittimus, Exhibit 1, at 45; *id.*, Bond Revocation, Oct. 2, 2020. On October 20, 2020, a Municipal Judge found that John Klosterman again violated the terms of his bond, *see* Exhibit 1, at 41 (imposing new bond conditions), by "send[ing] a letter . . . attempting to terminate the victims' lease while a protection order is in place." *See id.*, Bond Revocation, Oct. 19, 2020. On November 13, 2020, a Grand Jury indicted John Klosterman for a misdemeanor violation of a protective order, *Ohio v. Klosterman*, Case No. B2005843, Indictment for Violating a Protection Order, Nov. 13, 2020,

3

finding that John Klosterman's conduct that resulted in his second Menacing by Stalking Charge also violated the terms of the protection order that issued as a result of the first charge (John Klosterman's third such violation). *See Ohio v. Klosterman*, Case No. 20CRB21168, Complaint, Nov. 5, 2020. Finally, on June 24, 2021, the State filed a Motion to Revoke Bond alleging, among other things, that John Klosterman "has continued to engage in activities designed to harass and intimidate the [victim]," and that he "is attempting to retaliate against the victim by and through her connection with the property manager" that manages Defendants' properties under the Receivership. *Ohio v. Klosterman*, Case No. 20CRB17905, State's Motion to Revoke Bond, June 24, 2021. Currently, the victim resides in one of Defendants' properties under the Receivership. The motion also alleged that John Klosterman has been communicating with other tenants. *Id.* On July 7, 2021, a Municipal Judge found that John Klosterman again violated the court's orders and raised his bond. *Id.*, Judge's Sheet, Journal Entry – Mittimus at 3.

The United States' investigation of Defendants' compliance with the Decree, coupled with the revelations from the State's actions, have revealed that Defendants engaged in numerous and extensive violations of the Decree, which are detailed below.

### A. The Defendants Failed to Inform the United States of Five Rental Properties They Own and Manage

Decree ¶10 states as follows:

> Defendants affirm that they do not own, lease, or control any rental properties, with the exception of properties under receivership in *City of Cincinnati v. John Klosterman, et al.*, Hamilton County C.P. Case No. A1905588 (the "Receivership").

Decree, ECF No. 92, at PageID 4890. The United States relied on this representation—which it has since discovered was false—in negotiating the terms of the settlement and monitoring Defendants' compliance with the terms of the Decree. Additionally, paragraph 11 of the Decree

4

requires Defendants to inform the United States if they acquire an interest in any residential rental property. *Id*.

John Klosterman admitted to the United States that, contrary to Defendants' representation in the Decree, he has, "for over a decade," also owned at least five other properties that were not in the Receivership: 621, 623, 634, 787, and 801 Delhi. Exhibit 2 at 3. John Klosterman acknowledged conducting rental activities at these properties and stated that he "retained properties that the City failed to attach [to its] judgment," and that he intended to use "the income generated from the units" to satisfy the judgment in this case. *See id*. at 2. Because of Defendants' misrepresentations in the Decree to the United States and to this Court, the United States believed that all of the Defendants' rental properties were under the Receivership for over four months from the date of the Decree, an understanding that informed the United States' monitoring of Defendants' compliance with the Decree.

### B. John Klosterman Has Continued to Actively Manage Rental Properties, Including Continuing to Communicate with Tenants and Prospective Tenants, in Violation of the Decree.

Paragraph 12 of the Decree permanently enjoins John Klosterman from engaging in *any* property management responsibilities, including any activities that involve or may involve contact with tenants or prospective tenants, such as renting apartments and collecting rent. Decree, ECF No. 92, at PageID 4981. Additionally, paragraph 20 permanently enjoins Defendants from "contacting or communicating . . . with former or prospective tenants" of their rental properties. *Id*. at PageID 4983. "'Contact or communications' includes, but is not limited to, physical contact, verbal contact, telephone calls, e-mails, faxes, written communications, text or instant messages, contacts through social media, or other communications made through third parties." *Id*.

5

John Klosterman admitted in communications with the United States that he was recently involved in rental negotiations with at least one prospective tenant. Exhibit 2 at 6. Additionally, he stated in a subsequent email that he personally "instructed the 2 tenants at 801 Delhi to send rents via money order until I have found a new manager." Exhibit 3. John Klosterman also admitted that he engaged a tenant and later a prospective tenant to perform property management responsibilities. Exhibit 2 at 3-6. And the State of Ohio's charges allege additional instances of John Klosterman's property management and communication with a tenant. *See* supra at 3-4.

John Klosterman admitted to the United States that "I knew that I would have nothing to do with tenants" as a result of the Decree, and that he "agreed wholeheartedly" with this requirement. Exhibit 2 at 2. And yet by his own admission he undertook property management responsibilities—and is still undertaking property management responsibilities—in knowing and willful disregard of the Decree. *See* supra at 3-4.

### C. Defendants Failed to Retain an Independent Manager Approved by the United States to Manage their Properties, in Violation of the Decree.

The Decree requires that, for any properties owned by Defendants outside of the Receivership, Defendants must "retain an Independent Manager, to be approved in writing by the United States, to perform all property management duties. . . ." Decree, ECF No. 92, at ¶13, PageID 4891. The Decree defines an "Independent Manger" as "an individual or entity reasonably experienced in managing rental properties and who has no current or past employment, financial, contractual, personal, or familial relationship with Defendants." *Id*. Additionally the Decree requires the Defendants to ensure that the Independent Manager performs eight specific functions designed to prevent future discrimination at any property owned by Defendants, such as implementing a policy against sexual harassment, providing the

6

United States with tenant lists, and notifying the United States about potential violations of the Decree. *Id.*, at ¶16, PageID 4981-82.

Defendants have not retained an Independent Manager at any time since the entry of the Decree on October 1, 2020. John Klosterman asserts that he has engaged with at least five property managers since August 1, 2020: NCN Property Maintenance ("NCN") (August 1, 2020 to November 2020); Zell Hatfield (in or around November 2020 to March 3, 2021); Amy Mcintire (beginning March 6, 2021 end date unknown); Sharri Rammelsburg (beginning April 2021, end date unknown); and Judy Tausch (beginning on or around June 24, 2021). *See* Exhibit 2 at 3-6; Exhibit 3; Exhibit 4.

None of these purported property managers were ever proposed by Defendants, much less approved by the United States as an Independent Manager, and Defendants have offered no proof that any of them have implemented the policies and practices required by paragraph 16 of the Decree. EFC No. 92, at PageID 4982.[2] For example, none of these individuals ever provided the United States with tenant lists or informed the United States that John Klosterman violated the Decree. *See* Decree, ECF No. 92, at ¶16, PageID 4981-82. Additionally, John Klosterman admitted that Ms. Hatfield is a current tenant and Ms. Mcintire was a prospective tenant of the Defendants. Exhibit 2 at 4-6. Their status as tenants, particularly in light of the prohibitions on John Klosterman having contact with tenants and prospective tenants, precludes either from serving as the Independent Manager required by the Decree. Further, after Defendants unilaterally appointed Ms. Rammelsburg to be their property manager (without seeking approval from the United States as the Decree required), the United States interviewed her and determined

---

[2] John Klosterman's March 5 Letter states that Defendants' manager—who was not an Independent Manager approved by the United States—would be posting "Posters" by March 8, 2021. Exhibit 2 at 6. It is possible that these are the "Equal Housing Opportunity" posters required by Decree ¶16(c). The United States has not received confirmation regarding the content of these posters, or that they were actually posted.

7

that she was unqualified to serve as an Independent Manager because, by her own admission, she was performing some—but not all—property management functions as a personal favor based on her friendship with John Klosterman. Exhibit 5 at 4-5.

Finally, as John Klosterman noted when he informed the United States that Judy Tausch would manage his rental properties, she is John Klosterman's sister. Exhibit 4. This personal relationship with the Defendants precludes her from serving as the Independent Manager. *See* Decree, ECF No. 92, at ¶13, PageID 4981. Additionally, the State of Ohio alleges in its most recent Motion to Revoke Bond that Ms. Tausch, at John Klosterman's direction, interfered with the Receivership by posing as an "investor" interested in the properties and speaking with a tenant. *Ohio v. Klosterman*, Case Nos. 20CRB17905, 20CRB18773, 20CRB19488, 20CRB21069A, B, 20CRB21168, Motion to Revoke Bond, June 25, 2021.

### D. Neither Defendants nor Their Agents Completed Fair Housing Act Training, as Required by the Decree.

The Decree requires that Defendants complete Fair Housing Act training approved by the United States within 30 days of obtaining ownership of rental properties outside of the Receivership. Decree, ECF No. 92, at ¶22, PageID 4983. And it also requires that Defendants' employees and agents complete Fair Housing Act training within 30 days of commencing their responsibilities. *Id.* at ¶23, PageID 4983-84.

Defendants have never sought United States' approval for any Fair Housing Act training; nor have they completed Fair Housing Act training. *See, e.g.,* Exhibit 5 at 4. John Klosterman indicated to the United States that he "signed up for a course Sexual Harassment [sic] class" provided by sexualharassmenttraining.com in January 2021, but never took it. Exhibit 2 at 6. Furthermore, contrary to the requirements of the Decree, John Klosterman never sought nor obtained approval from the United States confirming that this training satisfies the training

8

requirements of paragraph 22 of the Decree. The United States reviewed the proposed training and informed John Klosterman that it did not satisfy the Decree's terms, because it was limited to sexual harassment in the workplace, did not address sexual harassment in housing, and was not delivered face-to-face or via video conferencing. Exhibit 5 at 4. Nor have Defendants ever taken any steps to obtain approved Fair Housing Act training for Susan Klosterman or any of Defendants' agents or employees. *See, e.g.,* Exhibit 5 at 5.

### E. Defendants Have Not Deposited $10,000 in Damages into an Escrow Account, in Violation of the Decree.

The Decree required Defendants to pay $162,500 up front[3] and then to pay an additional $15,000 in damages in three instalments of $5,000 by depositing them into an interest-bearing escrow account. *See* Decree, ECF No. 92, at ¶¶27-32, PageID 4984-85. The Decree required defendants to deposit the first installment by April 1, 2021, to deposit the second installment by July 8, 2022, and to provide proof of each deposit. *See id.*

On March 29, 2021, contrary to the requirements of the Decree, the Defendants sent the United States a check for $5,000. The United States returned this check[4] to Defendants and requested on multiple occasions that they deposit the money into an escrow account, as required by the Decree. *See, e.g.,* Exhibit 5 at 8; Exhibit 10 at 3. Despite these requests, Defendants have failed to provide any proof to the United States that either of the installment payments due on April 1, 2021 and July 8, 2021 have been deposited as specified by the Decree.[5] *See, e.g.,* Exhibit 5 at 8; Exhibit 11 at 1.

---

[3] Defendants' insurer made a majority of this payment on behalf of Defendants.

[4] The United States is unable to receive damages payments from Defendants and transfer them to aggrieved persons.

[5] John Klosterman's June 24, 2021 letter and July 4, 2021 email assert that he resolved this deficiency and is now in compliance. Exhibit 4; Exhibit 6. However, Defendants have not provided the information related to this deposit required by the Decree and requested by the United States on multiple occasions. *See, e.g.* Exhibit 5, Exhibit 10, Exhibit 11.

### F. The United States Has Been Unable to Obtain Defendants' Voluntary Compliance with the Decree.

Pursuant to paragraph 46 of the Decree, counsel for the United States made extensive good faith efforts to obtain Defendants' compliance with the Decree. *See* Decree, ECF No. 92, at ¶46, PageID 4988. On February 18, 2021, after learning about Defendants' properties outside of the Receivership, the United States informed Defendants of its concerns. Exhibit 7. On March 5, 2021, John Klosterman responded to the United States' request for information only in part and admitted to violations of the Decree's key provisions as described above. *See* Exhibit 2. Despite the United States' request, John Klosterman did not agree to comply with the terms of the Decree or provide information to the United States regarding Defendants' attempts to do so. *See id.*

The United States responded on April 6, 2021, setting forth in detail Defendants' obligations under the Decree and the areas of their noncompliance and requesting that they take specific actions to come into compliance with the Decree's requirements. Exhibit 5. John Klosterman responded on April 23, ignoring a majority of the United States' requests and, as described above, addressing, insufficiently, only Defendants' failures to secure an Independent Manager and deposit $5,000 in monetary damages. Exhibit 8; Exhibit 9.

On May 6, 2021, the United States responded by letter, again detailing Defendants' deficiencies and requesting compliance with the Decree. Exhibit 10. John Klosterman responded by email on May 26, 2021, again ignoring a majority of the United States' requests and declaring that he was communicating with tenants about rent payments and directly collecting rent. Exhibit 3. Despite never addressing a majority of the United States' concerns, John Klosterman again wrote the United States on June 24, 2021, stating that he believed that there were no outstanding deficiencies regarding Defendants' compliance and informing the United States that his sister would serve as manager. Exhibit 4. Although the United States once again referred him to its

10

multiple letters regarding Defendants' deficiencies, John Klosterman emailed the United States on July 4, 2021, and again did not provide the information requested. Exhibit 6.

### III. ARGUMENT

Civil contempt may be entered as "a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *see also United States v. Bayshore Assocs., Inc.,* 934 F.2d 1391, 1400 (6th Cir. 1991) ("Broadly, the purpose of civil contempt is to coerce an individual to perform an act or to compensate an injured complainant."). To find liability for civil contempt, the complainant must "produce clear and convincing evidence," *Elec. Workers Pension Trust Fund v. Gary's Electric Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003), to "establish that: a valid, definite and specific order of the court existed; the respondent had knowledge of the order; and the respondent violated the order." *Lane v. Lane*, No. 20-5399, 2020 WL 9257958, at *2 (6th Cir. Dec. 22, 2020) (internal quotation omitted).

For civil contempt, "the test is not whether defendants made a good faith effort at compliance but whether 'the defendants took all reasonable steps within their power to comply with the court's order.'" *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991) (citing *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989). "[A]ll reasonable steps within their power . . . includes whether the defendants have 'marshal[ed] their own resources, assert[ed] their high authority, and demand[ed] the results needed from subordinate persons and agencies in order to effectuate the course of action required by the [court's order].'" *Gnesys, Inc. v. Greene*, 437 F.3d 482, 493 (6th Cir. 2005) (quoting *Glover*, 934 F.2d at 708).

Upon finding contempt, "'[t]he measure of the Court's power in civil contempt proceedings is determined by the requirements of full remedial relief,'" and "'may entail the

11

doings of a variety of acts. . . .'" *NLRB v. Aquabrom*, 855 F.2d 1174, 1187 (6th Cir. 1988) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949)). Courts have broad authority to impose appropriate relief upon finding contempt which will be reviewed only for abuse of discretion. *Rolex Watch USA, Inc. v. Crowley*, 74 F.3d 716, 721 (6th Cir. 1996).

In addition, a court also has broad, inherent authority to enforce a consent decree it has entered, including by ordering remedies necessary to cure the violations. *See, e.g.*, *Peacock v. Thomas*, 516 U.S. 349, 356 (1996). As a general matter, a "federal court's interest in orderly, expeditious proceedings justifies any reasonable action taken by the court to secure compliance with its orders." *Gates v. Collier*, 616 F.2d 1268, 1271 (5th Cir. 1980) (citation and internal quotation marks omitted). Where "a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *see also Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999) ("[A] court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case."). And the All Writs Act empowers a court to issue orders or injunctions "necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) (quoting 28 U.S.C. § 1651(a)).

For the reasons stated below, the United States respectfully requests that this Court: (A) enter a finding of civil contempt against the Defendants; (B) order the Defendants to pay monetary sanctions to ensure compliance with the Decree; and (C) order additional injunctive relief to enforce the terms of the Decree.

### A. The Defendants Should Be Held in Civil Contempt because They Have Repeatedly Violated the Terms of the Decree Despite Repeated Demands for Compliance.

The Defendants' repeated and ongoing refusal to comply with the Decree justifies a finding of civil contempt in this case. The Decree is "a valid, definite and specific" order of the Court of which Defendants had knowledge. *Lane*, 2020 WL 9257958, at *2. Indeed, the Defendants themselves negotiated the terms of the Decree, which inherently "embodies [the] agreement of the parties . . . that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992)); *see also United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.").

Defendants' refusal to comply with multiple, significant terms of the Decree, as set forth above, demonstrates that the Defendants have violated the order and have not taken "[a]ll reasonable steps within their power to comply with the court's order." *Glover,* 934 at 708 (internal quotation omitted). To the contrary, from the moment they signed the Decree, the Defendants concealed their ownership of rental properties outside of the Receivership and have since undermined the Court's injunctive relief. In direct contravention of the Decree's requirements, Defendants have ignored virtually every substantive provision of the Decree, despite repeated attempts by the United States to enforce compliance. Since the Decree became effective more than nine months ago, Defendants have never retained an Independent Manager approved by the United States, continue to engage in numerous property management tasks across multiple properties including negotiating apartment rentals and collecting rent,

13

communicate with tenants and prospective tenants, and have never completed Fair Housing Act training approved by the United States.

Although Defendants did set aside $5,000 for their direct payment of monetary damages, they failed to make the payment in the manner required by the Decree to ensure that these funds will be available to the victims of John Klosterman's severe and pervasive sexual harassment. The United States informed the Defendants of the Decree's specific requirements for depositing this money on two occasions and for providing appropriate verification to the United States, instructions which the Defendants initially ignored. Although Defendants now assert compliance with this requirement, they have not submitted information to the United States sufficient for the United States to confirm that purported compliance, as required by the Decree.

Defendants' recalcitrance continues today, despite the United States' repeated demands that they comply with the Decree. The Defendants have not denied, and in many cases have themselves substantiated, the majority of these allegations. Through their knowing and purposeful actions that directly contradict the clear and express terms of the Decree, Defendants continue to flout the authority of this Court and its order. A finding of civil contempt is therefore warranted in this case, and Defendants should be required to follow the terms of this Decree and order of this Court.

### B. The Court Should Assess Monetary Fines to Ensure Compliance with the Decree.

Among its powers, a court may remedy civil contempt "by fine or imprisonment, or both, at its discretion," for disobedience or resistance to its lawful orders. 18 U.S.C. § 401(3); *United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1000 (8th Cir. 1970) (noting 18 U.S.C. § 401(3) provides "general statutory authority for . . . both civil and criminal contempt sanctions"); *see also Jaques v. Reiss Steamship Co.*, 761 F.2d 302, 305 (6th Cir. 1985) (citing

*Barco*, 430 F.2d at 1000). "When a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994).

A contempt fine is considered civil in nature if its purpose is to compensate another party for losses sustained or to coerce compliance with a court order. *Lane*, 2020 WL 9257958, at *2 (citing *Bagwell*, 512 U.S. at 829); *see also Nye v. United States*, 313 U.S. 33, 42 (1941) (noting that, unlike the punitive nature of criminal sanctions, civil contempt sanctions are "wholly remedial"). A compensatory contempt fine is "based upon evidence of complainant's actual loss." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947); *see also Gannett Outdoor Co. v. Westland*, 875 F.2d 863 (6th Cir. 1989) (compensatory contempt fines are based on "complainant's actual loss"). Disgorgement of profits may be awarded as a compensatory fine pursuant to a civil contempt proceeding "to ensure full compensation to the party injured." *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 456.

A civil contempt fine that is not compensatory must afford "the contemnor . . . an opportunity to purge" the contempt. *Lane*, 2020 WL 9257958, at *2 (citing *Bagwell*, 512 U.S. at 829). For example, a "'per diem fine imposed for each day that a contemnor fails to comply with an affirmative court order . . . exert[s] a constant coercive pressure" to obey. *Bagwell*, 512 U.S. at 829; *see also Consolidated Rail Corp. v. Yashinsky*, 170 F.3d 591, 596 (6th Cir. 1999). The contemnor can relieve himself of this financial pressure through full, timely compliance with the court's order. *See Bagwell*, 512 U.S. at 829. This type of penalty is "designed to compel future compliance with a court order," and so is "considered to be coercive and avoidable through

15

obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Id.* at 827.

In light of the Defendants' deliberate and prolonged violations of this Court's Decree, the United States respectfully requests that the Court issue an order requiring the Defendants to pay prospective contempt fines as follows:

1. pay $100 per day to the United States if, within ten days of this Court's Order, the Defendants have not proposed to the United States a professional Independent Manager who has experience with property management and does not have a personal relationship with Defendants, pursuant to paragraph 13 of the Decree. Such daily fine shall continue until Defendants have made a proposal that complies with the requirements of the Decree.

2. pay $100 per day to the United States if, within ten days of this Court's order, Defendants have not proposed to the United States Fair Housing Act training for Defendants and their employees and agents, pursuant to paragraphs 22 and 23 of the Decree. Such daily fine shall continue until Defendants have made a proposal that complies with the requirements of the Decree.

3. pay $100 per day to the United States if, within ten days of this Court's Order, Defendants have not deposited the two $5,000 installment payments due on April 1 and July 8, 2021 into an escrow account and provided proof to the United States in the manner required by paragraph 30 of the Decree. Such daily fine shall continue until Defendants have provided the required verification.

4. pay $500 per incident to the United States as a fine for each time following the Court's Order that Defendants engage in property management responsibilities prohibited by the terms of

16

the Decree or communicate with tenants or prospective tenants in violation of the Decree, unless there is an emergency that affects the habitability of a tenant's home.

### C. The Court Should Order Additional Injunctive Relief to Effectuate the Decree.

In addition to requiring Defendants to pay fines if they continue to violate the Decree, the Court's broad remedial powers also give it authority to order additional injunctive relief to effectuate the purpose of the Decree and exact compliance. *See Swann*, 402 U.S. at 15; *Carter-Jones Lumber*, 166 F.3d at 846. Therefore, the United States requests that the Court:

### 1. Require the Defendants to Identify All of Their Rental Properties.

Because Defendants misrepresented the extent of their rental properties, the Court should order the Defendants to provide to the United States, within ten days of its order, a complete list of all rental properties they have owned, managed, or otherwise controlled since the entry of the Decree, verified with a declaration made under penalty of perjury pursuant to 28 U.S.C. § 1746. This will ensure that the Court and the United States have a complete list of Defendants' current holdings.

### 2. Require the Defendants to Provide an Accounting of Rental Profits.

Because the Defendants falsely represented to the United States and this Court that they had no rental properties outside of the Receivership (and therefore no rental income), the Court should order Defendants to provide to the United States, within ten days of its order, a full accounting of incomes and expenses at all properties owned by Defendants outside of the Receivership since October 1, 2020, including bank records, rent receipts, and receipts for any expenses for the maintenance of the properties which Defendants maintain should be properly deducted from the calculation of profits. After receiving this information, the United States can consider whether to move the Court to require Defendants to pay rental profits into a fund for the

17

Independent Manager's maintenance of the properties, to restore the parties to the position that they would have been in but for Defendants' noncompliance with the Decree and to ensure that the funds that would have been available to an Independent Manager for property management will be available going forward.

### 3. Require the Defendants to Provide Periodic Reports to the Court.

The United States has spent considerable time and effort verifying a panoply of the Defendants' violations of the Decree and exhorting Defendants' compliance, to no avail. However, the duty to comply with this Court's Decree falls upon the Defendants, not upon the Plaintiff, nor upon the tenants who have had no choice but to engage directly with John Klosterman despite the Decree's requirement of an Independent Manager. Accordingly, the United States requests that within ten days of this Court's order, and every sixty days thereafter for the duration of the Decree, the Defendants be required to file with the Court a certification specifically confirming that they have complied with all Decree requirements and all subsequent orders of this Court and articulating the steps they have taken to do so.

### 4. Extend the Duration of the Decree by Nine Months, until July 2026.

By mutual agreement of the parties, and as endorsed by the Court, the provisions of the Decree were to have been in effect for a period of five years. Decree, ECF No. 92, at ¶42, PageID 4988. As recounted herein, the Defendants' conduct has, in effect, shortened the compliance period by at least nine months, measured by the period between October 1, 2020, when the Defendants signed the Decree, and July 1, 2021. The Defendants' actions to circumvent this Court's Order should not be permitted to achieve this result. The Decree itself provides that "the United States may move the Court to extend the period in which [the Decree] is in effect if one or more Defendants violates one or more terms of the Decree or if the interests of justice so require." *Id*. On the basis of Defendants' contemptuous conduct, and to dissuade the

18

Defendants from continued acts of defiance, the United States moves the Court to extend the duration of the Decree until July 1, 2026, and to retain jurisdiction until that time.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court enter a finding of civil contempt against the Defendants and impose injunctive relief and sanctions as set forth above.

Dated: July 27, 2021

Respectfully Submitted,

| | |
|---|---|
| VIPAL J. PATEL<br>Acting United States Attorney | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| s/Matthew J. Horwitz<br>MATTHEW J. HORWITZ (0082381)<br>Assistant U.S. Attorney<br>United States Attorney's Office<br>Southern District of Ohio<br>221 East Fourth Street, Suite 400<br>Cincinnati, Ohio 45205<br>Tel: (513) 684-3711<br>Matthew.Horwitz@usdoj.gov | s/Katharine F. Towt<br>SAMEENA SHINA MAJEED<br>Chief<br>TIMOTHY MORAN<br>Deputy Chief<br>KATHARINE F. TOWT (MA 690461)<br>AMIE S. MURPHY (NY 4147401)<br>Trial Attorneys<br>Housing and Civil Enforcement Section<br>Civil Rights Division<br>U.S. Department of Justice<br>4 Constitution Square<br>150 M Street, NE, Room 8.1108<br>Washington, DC 20530<br>Phone: (202) 305-8196<br>Fax: (202) 514-1116<br>E-mail: Katie.Towt@usdoj.gov |

## **CERTIFICATE OF SERVICE**

I certify that on July 27, 2021, a copy of the foregoing Motion to Enforce was filed by CM/ECF and will be electronically served on all counsel of record though that system. Additionally, on the same date, a copy of the foregoing was served upon Defendants John and Susan Klosterman by U.S. mail at the following addresses:

John and Susan Klosterman
5615 Sidney Road
Cincinnati, Ohio 45238

John Klosterman
JMS Number 1732946
Control Number 778594
Hamilton County Justice Center
900 Sycamore Street
Cincinnati, Ohio 45202

A copy was also sent on the same date by electronic mail to johncklosterman@gmail.com.

                                                              s/Matthew J. Horwitz
                                                              MATTHEW J. HORWITZ (0082381)
                                                              Assistant U.S. Attorney