**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,                                    Case No. 1:18-cv-194

     Plaintiff, and                                                Barrett, J.
                                                                              Bowman, M.J.

HOUSING OPPORTUNITIES
MADE EQUAL INC.,

     Plaintiff-Intervenor,

         v.

JOHN KLOSTERMAN and
SUSAN KLOSTERMAN,

     Defendants.

**REPORT AND RECOMMENDATION**

     This matter is before the Court upon the motion of the United States to enforce a Consent Decree ("Decree") entered into by Defendants John and Susan Klosterman, which Decree was designed to enjoin and remedy John Klosterman's pattern or practice of sexually harassing tenants at his residential rental properties. The motion has been referred to the undersigned for initial consideration and a Report and Recommendation. (Doc. 96). For the reasons that follow, the motion should be GRANTED.

**I.      Factual and Procedural Background**

     This Fair Housing Act case was the first of several related cases involving Defendant John Klosterman, and to a lesser extent, his wife Susan Klosterman. With the exception of a bankruptcy petition,[1] most cases were filed in state court. The above-

_____

[1]In May 2019, Defendants filed a pro se bankruptcy petition and invoked the automatic stay provision in this case. However, this Court granted the Motion of the United States in Opposition to Imposition of the

captioned case was initiated by the United States on March 21, 2018, and alleged that Mr. Klosterman sexually harassed female tenants living in properties in which he and his wife had an ownership interest, in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (Doc. 1). Specifically, the United States alleged that Mr. Klosterman, since at least 2013, discriminated on the basis of sex against female tenants by engaging in conduct that included: (1) making unwelcome sexual comments and advances, and sending unwelcome sexual text messages and photographs; (2) touching female tenants on their bodies without their consent; (3) offering to grant housing benefits in exchange for sex; (4) taking adverse housing actions - such as refusing to make repairs or threatening eviction - against female tenants who refused his sexual advances; (5) expressing a preference for renting to single female tenants; and (6) entering the homes of female tenants without their consent and monitoring their daily activities through cameras or other means. (*Id.* ¶ 11 at PageID 2–3). On August 2, 2018, Housing Opportunities Made Equal, Inc. (HOME) intervened as an aggrieved party. (Doc. 25).

Defendants were represented by counsel from the outset of this case through its resolution with the entry of a Consent Decree. This Court facilitated that resolution, and on August 17, 2020 noted that the case was "settled in principle pending Defendant Susan Klosterman's signature on the consent decree and procurement of final approval by the Assistant Attorney General." (Minute Entry 8/17/2020). By September 30, 2020, all parties had signed the Consent Decree and jointly moved the Court to approve it; on October 1, 2020, this Court entered the Decree. (Docs. 91, 92). In general, the Decree: (1) includes what is presumed to be an accurate statement of Defendants' rental property

---

Automatic Stay, concluding that this Fair Housing Act action was specifically exempt from the stay provision. (Doc. 43).

holdings and requires Defendants to notify the United States of any change to those holdings; (2) prohibits Defendant John Klosterman from continuing to personally interact with tenants or otherwise participate in the rental management business; (3) requires Defendants to turn over the management of rental properties to an independent property manager ("Independent Manager"); (4) requires Defendants and their agents to obtain Fair Housing Act training; and (5) requires Defendants pay $177,500 in monetary damages and civil penalties.  (Doc. 92, at ¶¶10-39, PageID 4980-86).

In the pending Motion to Enforce the Decree, the United States argues that Defendants have failed to comply with virtually all substantive provisions of the Decree. Pursuant to the Decree,[2] defense counsel filed a Notice of Withdrawal on April 9, 2021. (Doc. 94).  Recently on November 3, 2021, the United States filed a Motion to Substitute John Klosterman for Defendant Susan Klosterman, based upon the death of Susan Klosterman on October 20, 2021.  (Doc. 101).  Defendant John Klosterman continues to proceed pro se in opposition to the pending motion.

After this federal lawsuit was filed, separate civil litigation was filed on August 14, 2019 by the City of Cincinnati in the Hamilton County Court of Common Pleas to collect fees, fines, and other costs related to extensive violations of the Cincinnati Municipal Code and subsequent code enforcement efforts at rental properties owned by

---

[2] The Consent Decree stated that defense counsel "shall have no further obligations" after receiving releases signed by a group of aggrieved individuals.  (Doc. 92 at PageID 4986, Consent Decree ¶36 n.5). The last signed release was received on March 29, 2021.  (Doc. 94). The scope of defense counsel's representation after the Decree was entered but before counsel filed the Notice of Withdrawal is unclear. (See e.g., Doc. 95-5 at19, PageID 5097 (email from defense counsel stating that "we are now outside the scope of our assignment from the insurer," and that if the United States seeks "enforcement of the consent decree, we will not be acting on behalf of the Klostermans."); see also id. at 18, PageID 5096 (2/25/21 email stating that "our assignment has ended with the exception of the ministerial task of obtaining the last release."); Doc. 95-5  (4/6/21 letter from AUSA to Defendants, acknowledging that defense counsel is "no longer representing you.")).

Defendants. *See City of Cincinnati v. John Klosterman, et al.*, Case No. A1905588.[3] Highly relevant to this federal case is the fact that on February 14, 2020, the state court placed Defendants' rental properties under Receivership.  *Id.*, Order Appointing Receiver. Unbeknownst to the United States at the time, five rental properties owned or controlled by Defendants remained outside of the Receivership.

After this federal case was "settled in principle" but *before* this Court filed the Decree, the State of Ohio filed the first of two criminal charges of Menacing by Stalking against John Klosterman relating to his activities concerning a female who, until April 2021, resided in one of the properties that he owned outside of the Receivership.[4]  The first charge alleged that Defendant "showed up at [the victim's] residence unannounced and uninvited, likewise he has come to her place of employment unannounced and uninvited…[and] followed her in his car."  *Ohio v. Klosterman*, Case No. 20CRB17905, Affidavit, Sept. 17, 2020, and said "odd things to her."  *Id.*   Although the first state criminal charge was filed before the Decree was filed in this case, a second Menacing by Stalking Charge was filed on November 2, 2020, more than a month after entry of the Decree. *See Ohio v. Klosterman*, Case No. 29CRB21168, Complaint, Nov. 2, 2020.  The second charge involved the same female tenant, and alleged that Defendant "continued to show up at the victim's employment causing her to be in fear for her safety."  *Id.*

The United States has offered evidence that Defendant was found to have violated the conditions of his bond regarding the Menacing by Stalking charges on at least four occasions occurring on or after the entry of the Consent Decree, between October 2,

---

[3]Due to the volume of related civil and criminal proceedings in state court, Plaintiff has attached only a small portion of the relevant state court records as exhibits in support of its motion.  To the extent not included in Plaintiff's exhibits, this Court takes judicial notice of all state court records.
[4]The same individual now resides in a property under control of the Receivership.

2020 and June 24, 2021. (*See* Doc. 95 at 3-4, PageID 5002-03 (citing state court records)).  In addition, on November 13, 2020, a Grand Jury indicted Defendant for a misdemeanor violation of a protective order.  *See Ohio v. Klosterman*, Case No. B2005843, Indictment for Violating a Protection Order.  That indictment was based upon a finding that the conduct that resulted in the second Menacing by Stalking charge also violated the protection order issued in connection with the first Menacing by Stalking charge.  In August 2021, Defendant was found guilty of all state criminal charges and sentenced to serve a total of 360 days.

Three weeks before Defendant was found guilty of criminal charges, the United States filed the instant Motion to Enforce the Consent Decree.[5]  (Doc. 95).  Defendant John Klosterman filed an individual pro se "Answer" or response to the motion. (*See* Doc. 99).  Plaintiff-Intervenor HOME also has filed no response.[6]  The United States filed a reply in support of its motion.  (Doc. 100).

## II.    Analysis of Motion to Enforce the Decree

### A.  The Motion to Substitute John Klosterman

The United States filed a Motion to Substitute John Klosterman in place of Susan Klosterman, based upon the recent death of Susan Klosterman on October 20, 2021, which event moots any injunctive relief sought against her.  The United States seeks to substitute Defendant John Klosterman on the basis that any monetary damages that Mrs. Klosterman was obligated to pay to the victims of sexual harassment in this case survive

---

[5]Because the case was administratively closed following entry of the Decree, the motion of the United States is construed as a motion to re-open the case to enforce the Decree.
[6]The lead attorney for HOME withdrew from representation after entry of the Consent Decree, but her Notice of Withdrawal states that "Alphonse A. Gerhardstein of the new law firm of Friedman, Gilbert + Gerhardstein, LLC has consented to substitute as Trial Attorney for Plaintiff if the case is re-opened." (Doc. 93). Mr. Gerhardstein entered his appearance on July 23, 2018, (Doc. 14). The receipt generated by the filing of Doc. 95 indicates that the motion was electronically sent to Mr. Gerhardstein on July 27, 2021.

her death.  John Klosterman is the presumed beneficiary of his wife's estate under Ohio law.

Under 28 U.S.C. § 2404, "a civil action for damages commenced by or on behalf of the United States," survives the death of a defendant and is enforceable against the estate as well as any surviving defendants.  In addition, Fair Housing Act claims typically survive the death of a party.  *See Revock v. Cowpet Bay Est Condo. Assoc.*, 853 F.3d 96, 108-110 (3d Cir. 2017); *see also generally Crabbs v. Scott*, 880 F.3d 292, 294 (6th Cir. 2018) (applying Ohio state law and finding a § 1983 claim survived death).  The undersigned agrees that substitution of John Klosterman in place of Susan Klosterman is appropriate for purposes of any remaining claims of monetary damages against her estate.

### B.  This Court's Authority to Interpret and Enforce the Decree

The Consent Decree was entered upon the Court's approval, and provides for the Court's retained jurisdiction.  The Decree grants prospective injunctive relief and provides the United States with a mechanism to petition the Court to enforce its terms.  (Doc. 92 at 11, ¶¶ 42, 46).  "It falls on the Court, as issuer of the Decree and the injunctive relief provided therein, to interpret and apply the terminology to the circumstances at hand." *McGoldrick v. Bradstreet*, 397 F.Supp.3d 1093, 1101 (S.D. Ohio  2019).  In interpreting the Decree, the Court is bound by principles of Ohio contract law.  *See Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir. 1998).  Thus, the Court must closely examine the precise language of the Decree to determine whether Defendants have violated its provisions.  "The Ohio Supreme Court has held that extrinsic evidence surrounding a contract may only be considered when the language of the contract is

unclear or ambiguous or when the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Waste Management of Ohio, Inc. v. City of Dayton*, 169 Fed. Appx. 976, 989, 2006 WL 620648, at *12 (6th Cir. 2006) (citing *Shifrin v. Forest City Enters., Inc.,* 64 Ohio St.3d 635, 597 N.E.2d 499, 501 (1992)).

### C. The Alleged Violations

### 1. The False Affirmation in ¶ 10 and Failure to Update Holdings in ¶ 11

The United States asserts that both Defendants violated a central tenet of the Decree that "requires Defendants to accurately represent and update the extent of their rental property holdings." (Doc. 95 at 2, PageID 5001). The undersigned agrees. At the time the parties entered into the Decree, the United States believed that <u>all</u> rental properties owned or operated by either of the Defendants had been placed under the control of a Receiver during the state court civil litigation. Defendants unequivocally confirmed the accuracy of that understanding in ¶ 10 of the Decree, which states:

> 10. Defendants affirm that they do not own, lease, or control any rental properties with the exception of properties under receivership in City of Cincinnati v. John Klosterman, et al, Hamilton County C.P. Case No. A190558 (the "Receivership").

(Doc. 92 at 3, ¶10).

The affirmation in ¶ 10 is foundational to the entire Decree. While ¶ 10 is the first paragraph in Section IV, appropriately captioned "**<u>INJUNCTION CONCERNING MANAGEMENT OF RESIDENTIAL RENTAL PROPERTIES,</u>**" multiple provisions of the Decree are defined by reference to the properties held under Receivership as discussed below. Closely related is ¶ 11, which requires Defendants to update the United States if they acquire any additional rental holdings outside of the Receivership.

> 11. If, at any time during the effective period of this Decree, either or both

> Defendants acquire a direct or indirect management, ownership, financial, or controlling interest in any other residential rental property (or if they maintain any such interest in any residential property following the Receivership), such property will be subject to the applicable provisions of this Decree.  Within 30 days of acquiring such an interest (or, for any properties currently owned and retained following the Receivership, within 30 days following the termination of the Receivership), Defendants will notify counsel for the United States of the nature of their interest in the dwelling or property; the address of the property; the number of individual dwelling units at the property; and any other information required under this Decree.  Defendants will further provide the United States with copies of any documents memorializing the transfer in interest of the property.

(*Id*. at ¶ 11).

Consistent with the foundational statement in ¶ 10, an earlier section contains terms and conditions that make plain that the Decree is intended to apply to "any residential property that is owned or operated" by Defendants.  Specifically, ¶ 7 in that section states: "Unless otherwise specified herein, the provisions of this Decree apply to any residential property that is owned or operated by any of the Defendants, or that is owned or operated by any entity of which any Defendant is an officer, agent, employee or partner, or in which any Defendant has any ownership, financial, or control interest, whether that property is currently owned or acquired during the term of this Consent Decree."  (Doc. 92 at ¶ 7, PageID 4979).

Soon after entry of the Decree, the United States began to suspect that the affirmation in ¶ 10 was false, and that one or both Defendants retained ownership or control of five additional rental properties outside of the Receivership. The United States sought clarification from defense counsel.  (*See* Doc. 95-7, email from Plaintiff's counsel to defense counsel dated 2/18/21, requesting a response not later than March 5 and expressing concern, based upon information "from the receiver that John Klosterman is renting properties that are not a part of the receivership").   Defense counsel promptly

responded via email dated 2/23/21, stating that counsel "have no knowledge about any of the allegations made by the receiver," expressly affirming that defense counsel "were under the belief that all of the Klosterman properties were under receivership," and indicating counsel would follow up with the Klostermans. (Doc. 95-5 at 19, PageID 5097).

In a March 5, 2021 letter that Defendant John Klosterman sent directly to the United States,[7] Defendant admits to owning five properties outside the Receivership, contrary to the affirmation made in ¶ 10.  (Doc. 95-2, stating that "[w]e own and have owned 621, 623, 634, 787, and 801 Delhi for over a decade.").  Defendant additionally admits that, with respect to 801 Delhi, he expanded any pre-existing ownership interest through a buy-out that occurred in October 2020.[8]  Therefore, Defendants admit to violating both ¶ 10 and ¶ 11 of the Decree.

Rather than accepting responsibility for the false affirmation, Defendant John Klosterman suggests that the United States should have been aware of the inaccuracy because the five properties "were all listed in the Bankruptcy documentation that the City and [t]he US Government were a part of in the first hearing of the Debtors." (Doc. 95-2 at 3).  Defendant also places a heavy share of blame on defense counsel.  Contrary to counsel's statements, Defendant insists that his attorneys knew "that I retained properties that the City failed to attach their judgment to and was also known at the withdrawn bankruptcy hearing."  (*Id*. at 2).  Defendant maintains that former counsel also knew that

---

[7]Defense counsel apparently forwarded the United States' email to Defendant John Klosterman and asked him to respond.  The United States represents that the Defendant's letter was received on or about March 5, 2021.
[8]To the extent that Defendants had an ownership interest in 801 Delhi at the time the Decree was entered, Defendant implies that interest was shared with a business partner.  The March 5, 2021 letter explains that "801 Delhi was owned by my old employee and partner of 30 years" but that "we decided that I would buy him out and [I] did so in October I believe." An October 2020 "buy out" date constitutes a change in Defendant's holdings that post-dates the Decree and triggers an obligation to report under ¶ 11.

Defendant intended to use "the income generated from the units" to satisfy the judgment owed under the Consent Decree. (Doc. 95-2 at 1).

Regarding his own culpability, Defendant suggests that he didn't have time to read through and didn't recall the terms of the Decree, which he only signed "at the last settlement meeting… after much back and forth … while [counsel] feverishly made whatever changes were discussed…." (*Id*. at 2).  He asserts that he believed that the settlement "was mostly about money and I recall nothing was said about any other important items," other than that he "would have nothing to do with tenants." (Doc. 95-2 at 2).  In a follow-up email, Defendant characterizes the false affirmation as a "good faith mistake," (Doc. 95-8, 4/23/21 email from Defendant to AUSA stating that "I will answer…any of the concerns that you had, including the good faith mistake in not reporting the 5 properties that the City failed to control.").

In his response in opposition to the motion to enforce the Decree, Defendant walks back some of his prior admissions, suggesting that at the time of the Decree, he "believed all rental properties [were] subject to the receivership," and "did not find out until later that five (5) properties were left off of the list of the receivership."  (Doc. 99 at 2).  As to any obligation to correct the error or update the list of holdings, Defendant asserts that he "fully expected [defense counsel] to notify the Court and the U.S. Attorney," and "did not find out until months later that [counsel] had removed himself from the case."  (*Id*.)[9]  In other words, Defendant's response to the pending motion focuses on evading personal responsibility for the false affirmation and/or failure to correct the record, in the same way

---

[9]Many of Defendant's vague statements are contradicted by the record.  For example, he seems to suggest that he was unaware of the withdrawal of defense counsel. Apart from the provision of the Decree that spelled out that counsel would have no further obligation after receiving releases signed by a group of aggrieved individuals, the Notice of Withdrawal was served on Defendants by certified mail. (Doc. 94).

that his March 5, 2021 letter and April 23, 2021 email imply that any errors were made by counsel, and/or in "good faith."

To the extent that Defendant believes he should escape culpability because he did not read the Consent Decree before signing, he is mistaken.  Under controlling Ohio law, a party cannot evade the terms of a contract that he knowingly signs by later pleading ignorance as to its terms.  It is a "long-held principle that parties to contracts are presumed to have read and understood them and that a signatory is bound by a contract that he or she willingly signed." *Preferred Capital, Inc. v. Power Eng. Group, Inc.,* 112 Ohio St.3d 429, 2007-Ohio-257, 860 N.E.2d 741, ¶10 (Ohio 2007).  "Further, if the parties have signed a written agreement, it is presumed that their minds have met and a contract made, even if one of the parties failed to read the agreement." *Hughes v. Cardinal Fed. Savings & Loan Assoc.*, 566 F. Supp. 834, 844 (S.D. Ohio 1983) (citing *Parklawn Manor v. Jennings-Lawrence Co.*,197 N.E.2d 390, 26 Ohio Op.2d 341, 344 (1962)).  In any event, nothing in Defendant's response disputes: (1) that the full extent of Defendants' rental holdings being held under Receivership was fundamental to the Decree; (2) that the affirmation set forth by Defendants in ¶ 10 was false when made, because Defendants actually owned or controlled five properties outside of the Receivership; and (3) that Defendants violated ¶ 11 by failing to notify the United States (at a minimum) of the acquisition of a new post-Decree interest in 801 Delhi.  Thus, undisputed facts reflect that Defendants made a false affirmation in ¶ 10 on the date of the Decree, and that they subsequently violated ¶ 11.

### 2. Violations of Paragraphs 12 and 20 of the Decree

The United States next argues that Defendant John Klosterman has violated an injunctive provision that permanently enjoins him from personally interacting with tenants or otherwise participating, directly or indirectly, in the rental management business. Again, the undersigned agrees, based upon the language agreed upon by the parties and entered by this Court.

> 12. John Klosterman is permanently enjoined from directly or indirectly performing any property management responsibilities at any residential rental property. For purposes of this Decree, "property management responsibilities" include the following: showing or renting housing units; processing rental applications; performing or supervising repairs or maintenance; determining tenant eligibility for subsidies or waivers of fees and rents; inspecting dwelling units; collecting rent and fees; entering occupied rental units; overseeing any aspects of the rental process; or engaging in any other property-related activities that involve, or may involve, personal contact with tenants or prospective tenants.

(Doc. 92 at 4, ¶12, PageID 4981). Unlike some provisions, ¶ 12 prohibits all property management activities by Defendant John Klosterman for "any residential rental property" without regard to whether those properties are held under Receivership.

Relatedly, ¶ 20 also permanently enjoins both John and Susan Klosterman:

> 20. Defendants are permanently enjoined from purposefully or knowingly contacting or communicating, either directly or indirectly, with any person identified by the United States as an aggrieved person in this action, or with former or prospective tenants of Defendants' former or future rental properties. "Contact or communications includes, but is not limited to, physical contact, verbal contact, telephone calls, e-mails, faxes, written communications, text or instant messages, contacts through social media, or other communications made through third parties.

(*Id.* at PageID 4982). Thus, ¶ 20 prohibits contact or communication with "former or prospective tenants" at "Defendants' former or future rental properties." To the extent that a reference to "former" tenants is ambiguous, the undersigned interprets the phrase to refer to all tenants who held leases prior to October 1, 2020, because the salient date

for interpreting the Decree was the date it was entered by this Court.  For the same reason, the undersigned interprets "former or future rental properties" in ¶ 20 to mean properties held or controlled by Defendants either before or after October 1, 2020, with a "prospective tenant" to mean any person seeking to rent from Defendants on or after October 1, 2021.

In his March 5, 2021 letter, Defendant admits that he knew at the time he entered into the Decree "that I would have nothing to do with tenants," and that he "agreed wholeheartedly" to that requirement.  (Doc. 95-2 at 2).  Yet, in the same letter, Defendant admits to being involved in rental negotiations with at least one prospective tenant. (Doc. 95-2 at 6).  Additionally, he states in his April email that he personally "instructed the 2 tenants at 801 Delhi to send rents via money order until I have found a new manager." (Doc. 95-3).  Thus, John Klosterman admits to violating both ¶ 12 and ¶ 20.  Defendant also admits to having employed a tenant and later a prospective tenant to perform property management responsibilities, which also violated both provisions.  And another property manager identified by Defendant, Ms. Rammelsburg, informed the United States that Defendant was still "communicating with tenants and prospective tenants and collecting rents." (Doc. 95-10 at 2, PageID 5168).  Last, Defendant's recent state criminal charges involving multiple communications with a former tenant of 801 Delhi offer further evidence of his violations of ¶¶ 12 and 20 after entry of the Decree.[10]  (*See* Docs. 100-1, 100-2, 100-3).

---

[10]Defendant complains that some events occurred earlier, but does not dispute that other events occurred after October 1, 2021.  He also asserts that the state court convictions are not yet final; state records confirm that an appeal filed on August 24, 2021 remains pending. Regardless of whether the convictions are upheld in state court, Defendant does not dispute that he violated ¶¶ 12 and 20 of the Decree.

In his response in opposition to the pending motion, Defendant admits that ¶ 12 prohibits him from property management activities, thereby requiring him to employ someone else to engage in those activities for "any" rental properties – including those properties held outside the Receivership. Rather than disputing any of the clear violations of both ¶¶ 12 and 20, Defendant focuses on defending his actions, arguing that he "has had issues maintaining managers due to COVD-19 [sic] and the small number of units managed." (Doc. 99 at PageID 5191).[11] He excuses his violations on grounds that he had contact with tenants "only after his hired manager had quit." (Doc. 99 at 2). Other than – for the first time - seeking "guidance" on "how to proceed…in the event a manager quits," (*id.* at 7), the response offers no reassurance that Defendant will avoid improper communications in the future.

### 3. Defendants Have Failed to Retain an Independent Manager and Have Violated Paragraphs 13, 14, and 16

As discussed, ¶ 12 of the Decree specifically enjoins John Klosterman "from performing any property management responsibilities." In order to avoid "directly or indirectly" performing duties for "any" of his rental properties, Defendant was required to hire someone else. Paragraph 13 specifically directs both John and Susan Klosterman to employ an "Independent Manager," and cites to ¶¶ 11 and 12 in defining the duties of an Independent Manager that are applicable to "current or future rental properties." The United States argues that because neither of the Defendants have ever employed an Independent Manager, they have violated ¶ 13.

---

[11]Defendants have never reached out to the United States for advice or assistance to the extent that Defendants are now attempting to assert an "impossibility of performance" defense.

Muddying the waters somewhat, the language of ¶ 13 begins with prefatory language that ties the timing of hiring an "Independent Manager" to events connected to the Receivership, which again, the United States believed encompassed the entirety of Defendants' holdings based upon the affirmation made in ¶ 10.

> 13. *Prior to obtaining an ownership interest in any future rental properties or following termination of the Receivership should Defendants retain an ownership interest in any of the current rental properties*, Defendants will retain an Independent Manager, to be approved in writing by the United States, to perform all property management duties as described in paragraph 12 at any residential rental property Defendants own, lease, or control, including subsequently-acquired properties as set forth in Paragraph 11 ("current or future rental properties"). An "Independent Manager" is an individual or entity reasonably experienced in managing rental properties and who has no current or past employment, financial, contractual, personal, or familial relationship with Defendants.

(Doc. 92 at ¶13, PageID 4891, emphasis added). The italicized language of ¶ 13 seems to suggest that hiring an Independent Manager is based upon a contingent future event in that it is required *only* when Defendants acquire "future rental properties" (after October 1, 2020) or if Defendants retain an ownership interest "following termination of the Receivership" – an event that has not yet occurred.[12]

According to John Klosterman's March 5 letter, he owned five additional properties outside of the Receivership on October 1, 2020. However, he also admits to acquiring an additional interest in 801 Delhi after October 1, by "buy[ing] out" a former business partner. If for no other reason, Defendant's admission that he acquired an additional interest in 801 Delhi "in October" brings that property squarely into the "future rental

---

[12]Hamilton County Case No.#A 1905588 reflects an Entry Adopting Magistrate's decision and final decree in foreclosure was filed on October 7, 2021. However, it is clear from the record that Receivership proceedings continue. *See* Notice of Hearing on Amended Motion by Receiver to approve sale and sale terms, filed 10/27/21.

property" category for which an Independent Manager was required under the narrowest possible interpretation of ¶ 13.

Considering the equities involved in both Defendants' misrepresentation in ¶ 10 and reading the entirety of the Decree as a whole, however, the undersigned does not read the obligation to hire an Independent Manager in ¶ 13 to be as limited as a narrow reading of the prefatory language might suggest. The parties and the Court expressed the overarching intent of the Decree to apply to "all rental properties" (Decree, at ¶ 7). Although the language of a contract must be interpreted according to the language used by the parties (and the Court in this instance), Ohio law also provides that extrinsic evidence may be considered "when the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Waste Management of Ohio, Inc.*, 169 Fed. Appx. at 989. The language of ¶ 13 has such "special meaning" insofar as it was based upon the foundational affirmation made by Defendants in ¶ 10, and should therefore be construed to have the meaning intended. Alternatively, the undersigned recommends that the express language of ¶ 13 be reformed as a "mutual mistake."[13] Thus, to fulfill the intent of the parties, the undersigned construes ¶ 13 as if written as follows: "Prior to obtaining an ownership interest in any future rental properties or ~~following termination of the Receivership~~ should Defendants retain an ownership interest in any of the[ir] current rental properties, Defendants will retain an Independent Manager...."

Independent of the construction of ¶ 13, the United States argues persuasively that Defendants also have violated ¶ 16 of the Decree, which does not tie the hiring of an

---

[13]After all, even Mr. Klosterman maintains that the false affirmation was a "mistake."

Independent Manager to any particular event in time, but instead requires Defendants to perform eight specific duties through an Independent Manager for all "current or future rental properties."  Because Defendants failed to hire an Independent Manager at any point, they have not complied with duties required of the Independent Manager for *all* of their properties, including those held outside the Receivership.  In pertinent part, ¶ 16 states as follows:

16.  Defendants shall do the following through the Independent Manager for any current or future rental properties:

a. Implement, subject to the United States' approval, a written policy against sexual harassment, including a formal complaint procedure….

b. Ensure that any persons who will be performing any duties with respect to future rental properties are familiar with the requirements of the FHA…and this Decree.

c. Post an "Equal Housing Opportunity" sign in  any rental office….[14]

d. Require that all advertising…include either a fair housing logo, the words "equal housing opportunity provider," and/or the following sentence: [specific wording that connotes the lessor is an equal housing provider]….

e. Send to the United States within 30 days after the effective date of this Decree, and every six months thereafter…, a list of all tenants at future properties and their addresses.

f. Maintain all rental records… and allow the United States to inspect and copy such records….

g. Provide any information reasonably related to compliance with this Decree that is requested by the United States.

h. Notify the United States in the event the Independent Manager obtains any information indicating that Defendant John Klosterman is in violation of this Consent Decree or the Fair Housing Act….

---

[14] In his March 5, 2020 letter, Defendant states that Defendants' manager (who was not a qualified "Independent Manager") would be posting "Posters" in the near future, by March 8, 2021.  (Doc. 95-2 at 6). The United States concedes that the reference may be to the requirement in ¶ 16(c) that an Independent Manager post Equal Housing Opportunity posters.  However, Defendants have never provided confirmation of the content of the posters or whether they were in fact posted at all properties.

(Doc. 92 at 4-5, ¶ 16, PageID 4981-82).

Defendants also have violated Paragraph 14, which contains a notification procedure for any time in which the Defendants seek to change from one Independent Manager to the next.

> 14.  If, after retaining an Independent Manager, Defendants wish to change the Independent Manager for any reason, they shall submit the name of the prospective manager, in writing, to the United States for written approval at least ten (10) days prior to retaining the individual or entity, except in the event of an emergency.  If there is a need to retain an Independent Manager on an emergency basis, Defendants shall submit the name of the manager, in writing, to the United States within 48 hours.

(Doc. 92 at 4, PageID 4981).

In his March 5, 2021 letter as well as in his response in opposition to the Motion to Enforce the Decree, John Klosterman asserts that he has tried to comply with ¶¶ 13-16 by engaging at least five property managers since August 1, 2020:  NCN Property Maintenance ("NCN") (August 1, 2020 to November 2020); Zell Hatfield (in or around November 2020 to March 3, 2021); Amy Mcintire (March 6, 2021 through an unknown end date); Sharri Rammelsburg (beginning April 2021 through an unknown end date); and Judy Tausch (beginning June 24, 2021).  (Docs. 95-2 at 3-6, 95-3, 95-4; *see also* Doc. 99 at 3, 6).  In addition, Defendant states that he "has hired and is submitting for approval… Karen Goodman" as his Independent Manager.  (Doc. 99 at 6, PageID 5195). Other than claiming that he has tried to hire managers, Defendant does not dispute the well-supported contentions of the United States that he has never employed an Independent Manager and that no one has performed the eight requirements of ¶ 16. (*See* Doc. 99 at 4, arguing that Defendant "has acted in good faith…if not the letter [of the Decree] by hiring Independent Managers.").  It is also undisputed that prior to

proposing Ms. Goodman in response to the pending motion, Defendants made no attempt to gain advance approval for any of the alleged managers, and none were actually approved by the United States.

The United States points out that Defendant has admitted that Ms. Hatfield is a current tenant, and that Ms. Mcintire was a prospective tenant.  After Defendant mentioned Ms. Rammelsburg in his responsive memorandum, the United States interviewed her.  By Ms. Rammelsburg's own admission, she is unqualified to serve as an Independent Manager because she was performing some (but not all) of the property management functions as a personal favor based upon her friendship with John Klosterman.  (Doc. 95-5 at 4-5; *see also* Doc. 95-10 at 2, PageID 5168).  Judy Tausch was not an Independent Manager because Defendant admits she is his sister.  (Doc. 95-4).[15]  Finally, on October 5, 2021, the United States spoke with Ms. Goodman and learned that she also has a personal relationship with Mr. Klosterman through her son, who is an inmate incarcerated together with Defendant.  (Doc. 95, PageID 5005).  That relationship, including Defendant's promise to provide housing to Ms. Goodman's son once he is released from jail, precludes her from serving as an Independent Manager.[16]  In addition, while Ms. Goodman agreed to collect some (but not all) rents on Defendant's behalf, she expressly declined to serve as his property manager.  (Doc. 100-4).  In sum, Defendants have violated ¶¶ 13, 14, and 16 by failing to employ an Independent Manager, by failing

---

[15]The State of Ohio alleges in a motion to revoke bond that Ms. Tausch, at Defendant's direction interfered with the Receivership by posing as an "investor" interested in the properties and speaking with a tenant. *Ohio v. Klosterman*, Case Nos. 20CRB17905, 20CRB18773, 20CRB19488, 20CRB21069A, B, 20CRB21168, Motion to Revoke Bond, June 25, 2021).

[16]According to the United States, Ms. Goodman admitted she is in regular communication with Defendant, that he dictates her interactions with tenants and that he retains authority over property management responsibilities.  The United States has confirmed those communications through its review of recordings of jail telephone calls.

to notify or seek approval from the United States for any of the alleged managers, by changing managers frequently without notice to the United States or advance approval, and by failing to have any of the managers perform the eight duties set forth in ¶ 16.

**4. Defendants and Their Agents or Employees Failed to Complete Fair Housing Act Training Under Paragraphs 22 and 23**

The United States argues that Defendants also violated their duties under Section V of the Consent Decree, captioned "**EDUCATION AND TRAINING**."  These violations are undisputed.  Paragraph 22 directs Defendants to obtain Fair Housing Act training, while ¶ 23 mandates training for Defendants' agents and employees.  The precise language states, in relevant part:

> 22.  *Within 30 days of acquiring an ownership interest in any future rental property or following termination of the Receivership should Defendants retain an ownership interest in any of the current rental properties*, Defendants will attend an in-person training delivered face-to-face or via video conferencing with synchronous instruction on the Fair Housing Act, including the Act's provisions related to sexual harassment, other forms of sex discrimination, and discriminatory statements.  The trainer or training entity must be qualified to perform such training, must be independent of Defendants, and must be approved in advance by the United States.  Defendants will bear the cost of any expenses associated with this training.  ….Defendants will send a copy of these certificates [of attendance] to counsel for the United States within 10 business days of the training.

> 23.  During the effective period of this Decree, all new agents or employees of Defendants, including agents or employees of the Independent Manager, who are involved in showing, renting, managing or maintaining any residential rental properties owned, managed, or operated by Defendants, and all employees or agents who supervise such persons, shall, within 30 days of commencing an employment or agency relationship with Defendants or the Independent Manager, be provided the training described in Paragraph 22, or participate in an online training on the Fair Housing Act, including the Act's provisions related to sexual harassment and other forms of sex discrimination.  The online training program must be approved in advance by the United States.  New employees who are provided online training will participate in an in-person training as described in Paragraph 22, within one year of commencing an employment or agency relationship with Defendants.  Defendants will send a copy of the certificates of training…to counsel for the United States within 10 business day s of said training.

(Doc. 92 at 6-7, ¶¶22-23, PageID 4983-84 (emphasis added)).

The undersigned notes that ¶ 22 includes prefatory language similar to ¶ 13, which (if narrowly construed) suggests that the timeframe for Defendants to complete the requisite Fair Housing Act training begins to run only after acquisition of a "future rental property or following termination of the Receivership." If so construed, the obligation to complete Fair Housing Act training was nevertheless triggered when Defendant acquired an additional ownership interest in 801 Delhi after entry of the Decree. However, consistent with ¶ 13 and based upon the admitted false affirmation made in ¶ 10, the undersigned concludes that ¶ 22 should be construed more broadly. Thus, ¶ 22 should either be interpreted or reformed to reflect the parties' and this Court's intent, to capture all current (as of October 1, 2020) and future rental properties owned or controlled by Defendants. As reformed, ¶ 22 would state in relevant part: "Within 30 days of acquiring an ownership interest in any future rental property or ~~following termination of the Receivership~~ should Defendants retain an ownership interest in any of the[ir] current rental properties, Defendants will attend an in-person training delivered face-to-face or via video conferencing with synchronous instruction on the Fair Housing Act …." Under this interpretation, Defendants' obligation to take the Fair Housing Act training began to run on the date of the Decree.

Neither of the Defendants ever sought the United States' approval for any Fair Housing Act training, or completed any such training. John Klosterman admits as much. (Doc. 99 at 4; *see also* Doc. 92-5 at 4 and 6, email in which Defendant states that he "signed up for a course Sexual Harassment [sic] class" in January 2021, but never took it due to "billing issues."). In prior correspondence with Mr. Klosterman, the United States

explained that the on-line course that he claimed to have signed up for (but never took) did not satisfy the terms of the Decree in part because the course description indicated it was geared toward workplace harassment, and was not training that was relevant to the Fair Housing Act.  (Doc. 95-5 at 4).  In his response to the pending motion, Defendant complains that he has not been able to obtain training since he was taken into custody on state court criminal charges.  Whether Defendant is presently prohibited from video training remains unclear.  However, Defendant had more than 10 months to obtain training before he was incarcerated, and does not deny that he never sought approval for any training.

Defendants also have violated ¶ 23 because none of the employees, agents, or managers hired to perform duties at the five rental properties held outside of the Receivership have taken the Fair Housing Act training required. Unlike ¶ 22, there is no ambiguity that would suggests that the obligation set forth in ¶ 23 is contingent on some future event.  Instead, ¶ 23 expressly applies to all "agents or employees of Defendants," and to "any residential rental properties" owned, leased, or controlled by Defendants at any time during the term of the Decree.

### 5. Defendants Have Failed to Pay Monetary Damages into an Escrow Account in Violation of Paragraphs 27-32 of the Decree

The last set of provisions that Defendants have violated is contained in Section VI of the Decree, captioned "**MONETARY DAMAGES.**"  In ¶¶ 25-26, Defendants were required to pay a total of $162,500 up front, with payments divided between the United States, for the benefit of a list of aggrieved persons, and Plaintiff-Intervenor HOME.  (*Id.* at PageID 4984).  Defendants also were required to pay a civil penalty of $2,500.  (*Id.* at

¶ 39). According to the United States, "Defendants' insurer made a majority of [the initial] payment on behalf of Defendants." (Doc. 95 at 9, n.3).

Notwithstanding the completion of those initial payments, Defendants failed to comply with additional terms that required them to pay an additional $15,000 in damages in three installments of $5,000, to be deposited over the course of one year into an interest-bearing escrow account. (*See* Doc. 92 at ¶ 27). The first installment of $5,000 was to have been deposited within six months of the Decree, not later than April 1, 2021. (*Id*. at ¶28). Two additional $5,000 deposits were to have been made quarterly, not later than July 1 and October 1, 2021. The Decree requires Defendants to provide proof that each of the installment payments have been made into the escrow account as specified by the Decree. (*See*, *e.g*., Doc. 92 at ¶ 28, "Within 5 business days of the establishment of the Escrow Account, the Defendants shall submit proof to the United States that the account has been established and the funds deposited"; *id*. at ¶ 30, requiring the submission of similar proof after each quarterly deposit).

The record reflects that Defendants made some attempt to complete the initial payment due on April 1, 2021, when they sent the United States a personal check in the amount of $5,000 on March 29, 2021. However, the United States returned Defendants' check and explained in an April 6, 2021 letter that it did not meet the terms of the Decree, because the Decree clearly requires Defendants to establish and deposit the money into an interest bearing escrow account. (Doc. 95-5 at 8; Doc. 95-10 at 3 and 10). The letter explains in detail the requirements of ¶¶ 27-32, including the requirement to "establish an interest-bearing escrow account and deposit the money owed there, providing proof of these deposits to the United States." (*Id*.)

In an email response dated April 23, 2021, John Klosterman states that Susan Klosterman "tried to set up an escrow account at 5th bank [sic] and was told they only do it for mortgages with the bank, so I am going to ask her to setup a separate saving account at 5th 3rd today for the collection [of] the $15,000.00."  (Doc. 95-8, PageID 5165).  In a separate email later that same day, Defendant states "Sue Klosterman opened the savings account," and that "[t]here is $5,000.00 in the account."  (Doc. 95-10 at 7, PageID 5173).  However, via responsive email on May 6, 2021, the United States explained again that "[w]hile we appreciate this effort…, this deposit does not comply with the requirements of the Consent Decree," and emphasized that the deposit must be placed "**into an interest-bearing escrow account**" with "**proof of this deposit to the United States**." (Doc. 95-10 at 3, PageID 5169 (emphasis original)).

In emails dated June 24, 2021 and again on July 4, 2021, Defendant claimed to have resolved the deficiency regarding the "escrow" account.  (See Doc. 95-4, stating "that 5/3 Bank had made a mistake in not putting the $5000.00 into the escrow account, which is corrected"; Doc. 95-6, stating that "we have deposited the 2nd $5,000.00 in the 5/3 *escrow* savings account.") (emphasis added).  But in his response in opposition to the pending motion, Defendant now admits that there is still no escrow account, attempting to excuse the deficiency on grounds that he "could not set up this account because of house arrest."  (Doc. 99 at 5).

Two weeks prior to her death, on October 5, 2021, Susan Klosterman sent the United States a copy of a deposit slip, showing that a total of $15,000.00 has been deposited into a **savings** account that is not an escrow account.  (Doc. 100-5).  The United States has repeatedly explained that, while it appreciates Defendants' attempted

payment, Defendants have not complied with the requirement that Defendants establish and make payments into an <u>interest-bearing escrow account</u>, and have failed to identify any plan to transfer funds to such an escrow account. The "escrow account" distinction is a material term of the Decree. A savings account remains under Defendants' control, allowing Defendants to draw on it at any time. By contrast, an escrow account ensures that the money deposited cannot be removed except to compensate the identified victims of Mr. Klosterman's sexual harassment, as set forth in the Decree. The unrebutted evidence submitted by the United States demonstrates that the deposits made by Susan Klosterman prior to her death were made to a savings account and not to an escrow account.

**III. Defendant John Klosterman individually, and as Beneficiary of the Estate of Susan Klosterman, Should be Held in Contempt and Required to Comply with the Imposition of Additional Injunctive and Monetary Relief**

A court may find and enter civil contempt as "a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. .Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *see also United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1400 (6th Cir. 1991) ("[T]he purpose of civil contempt is to coerce an individual to perform an act or to compensate an injured complainant."). However, civil contempt may be imposed only if there is "clear and convincing evidence" that the opposing party knowingly "violated a definite and specific order of the court." *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987) (quotation and brackets omitted). "[W]hen deciding whether a court order is 'definite and specific,' courts must construe any ambiguity in favor of the party charged with contempt." *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795, 800 (6th Cir. 2017).

Based upon Defendants' failure to comply with the referenced provisions, the United States seeks an Order holding both Defendants in civil contempt. For the reasons discussed above, the undersigned finds that the United States has offered clear and convincing evidence that Defendant John Klosterman failed to comply with multiple "definite and specific" provisions of the Decree.[17] Clear and convincing evidence also shows that prior to her death, Susan Klosterman also failed to comply with many of the same provisions. From the moment that both Defendants signed the Decree, they concealed their ownership of rental properties outside of the Receivership, undermining foundational provisions of injunctive relief. At every turn, Defendants either ignored key provisions or made (at best) half-hearted attempts to comply after being called out on their violations by the United States.

To the extent that John Klosterman presently asserts an "impossibility" defense as an excuse for his failure to comply with any portion of the Decree, the undersigned rejects that defense because Defendant has failed to carry his burden of proof that he cannot comply. Once the movant has demonstrated a violation of the Consent Decree, "the onus shifts to the opposing party to demonstrate that it was unable to comply with the court's order." *Gascho*, 875 F.3d at 800. "But to show impossibility, [the defendant] has the burden to demonstrate that (1) [he] was unable to comply with the court's order, (2) [his] inability to comply was not self-induced, and (3) [he] took 'all reasonable steps' to comply." *Id.*, 875 F.3d at 802 (additional citation omitted).

---

[17]In *Gascho*, the Sixth Circuit held that an injunctive command that is based upon a contingency or future event that has not yet occurred is not sufficiently definite to be enforceable through an order of contempt. *Id.*, 875 F.3d at 801. The undersigned distinguishes the interpretation of ¶¶ 13 and 22 from *Gascho* insofar as Defendant's "buy out" of 801 Delhi in October 2020 rendered the obligations expressly contained in those provisions unequivocal, even if a reviewing court were to disagree with the undersigned's alternate interpretation and/or reformation of the terms contained therein.

Defendant's response in opposition to the motion does not seriously contest the facts presented by the United States but instead suggests that his multiple failures to comply with the Decree should be excused because he made some attempts to comply, and did not intend to make the false affirmation in ¶ 10. However, "the test is not whether defendants made a good faith effort at compliance but whether 'the defendants took all reasonable steps within their power to comply with the court's order.'" *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991) (citing *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)). Defendant John Klosterman now claims to be unable to set up the escrow account or to take the required training due to his incarceration. But his incarceration is a self-induced condition that did not occur until 10 months after the entry of the Decree. He has not demonstrated impossibility of performance or that he took "all reasonable steps" to comply prior to his incarceration. For example, there is no evidence that Susan Klosterman, who made deposits to a savings account prior to her death, could not have arranged for transfer of the deposited funds to an escrow account. On the record presented, the undersigned concludes that Defendant John Klosterman in particular has exhibited a laisse fare attitude toward the Decree that prioritizes personal profit and convenience to him. While Defendants made modest attempts to comply with the Decree, they continually ignored "the letter" of provisions that were difficult or inconvenient.

John Klosterman's suggestion that he didn't understand all the terms of the Decree at the time he signed it is no excuse for non-compliance, just as Susan Klosterman's actions or inactions prior to her untimely death did not excuse her non-compliance.[18] If

---

[18]Defendants previously moved for partial summary judgment on all claims against Susan Klosterman, arguing that she should not be held vicariously liable for her husband's conduct and should not be held directly liable based upon her own actions. (Doc. 62). The United States vigorously opposed the motion both on grounds that Susan Klosterman had an ownership interest "in all but one of the properties at which

Defendants did not receive a copy of the Decree at the outset (a highly doubtful claim), Defendants easily could have obtained a copy from the United States or from the Court. Indeed, the United States provided Defendants with a copy of the Decree during its unfruitful attempts to persuade Defendants to comply with its terms prior to finally filing a motion. The parties' correspondence during the months in which the United States attempted to bring Defendants into compliance illustrates Defendants' willingness to disregard the clear provisions of the Decree even when the United States took great pains to highlight the areas of deficiency.

A court has the authority to enforce a consent decree it has entered by ordering any remedies necessary to cure the violations. *See generally*, *Peacock v. Thomas*, 516 U.S. 349, 356 (1996). Upon a finding of civil contempt, a Court may order a "fine or imprisonment, or both, at its discretion." 18 U.S.C. § 401(3). "The measure of the Court's power in civil contempt proceedings is determined by the requirements of full remedial relief." *NLRB v. Aquabrom*, 855 F.2d 1174, 1182 (6th Cir. 1958). "When a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order." *Int'l Union United Mine Workers of Am. V. Bagwell*, 512 U.S. 821, 828 (1994). A finding of civil contempt is reviewed only for abuse of discretion. *Roles Watch USA, Inc. v. Crowley*, 74 F.3d 716, 721 (6th Cir. 1996).

---

Defendant John Klosterman harassed female tenants," and "directly collected rent from at least one of the tenants that John Klosterman sexually harassed," among other arguments concerning the parties' agency relationship. (Doc. 68). The Consent Decree, signed by Susan Klosterman, rendered the motion moot.

In light of the violations presented, the undersigned concludes that additional measures are necessary to ensure compliance with the Consent Decree. The United States persuasively argues that those measures should include prospective contempt fines for each day in which John Klosterman remains out of compliance, as well as additional injunctive relief as to that Defendant. With minor modifications to the relief proposed by the United States, the undersigned agrees that both fines and additional injunctive relief should be included in the Contempt Order. Particularly imperative, in light of the Defendants' false affirmation in ¶ 10, is a requirement for John Klosterman to provide the United States with a complete list of all residential properties owned, leased, or controlled by either of the Klostermans, either directly or indirectly, beginning on October 1, 2020 and continuing to the present day.

In addition to the additional monetary and injunctive relief, the United States seeks an extension of the Decree. The original Decree was to have remained in effect for a period of five years. The Decree specifically provides that "[t]he United States may move the Court to extend the period in which this Order [the Decree] is in effect if one or more Defendants violates one or more terms of the Decree or if the interests of justice so require." (Doc. 92 at 11, ¶ 42, PageID 4988). Both as punishment for the lengthy period of time in which Defendants continued to violate the Decree and to dissuade Defendant John Klosterman from additional noncompliance, the undersigned recommends that the original five-year term of the Decree be extended.

## IV.    Conclusion and Recommendations

Based upon the above analysis, **IT IS RECOMMENDED THAT:**

1. Plaintiff's Motion to Substitute John Klosterman for Defendant Susan Klosterman, (Doc. 101), should be GRANTED;

2. Plaintiff's Motion to Enforce the Consent Decree, as construed as a motion to re-open this case to Enforce the Consent Decree (Doc. 95) should be GRANTED;

3. The Court should enter a finding of civil contempt against both Defendant John Klosterman individually and as substitute for Susan Klosterman, and shall include the following provisions in the Contempt Order;

   a. The term of the October 1, 2020 Decree should be extended until July 1, 2026;

   b. The prefatory language in ¶ 13 and ¶ 22 of the October 1, 2020 Decree should be interpreted and/or formally reformed in the manner discussed above;

   c. The following prospective monetary sanctions should be added to the terms of the original October 1, 2020 Decree:

      i. $100 per day shall be paid to the United States if, within ten days of the Court's Contempt Order, Defendant John Klosterman has not proposed to the United States a professional Independent Manager who has experience with property management and does not have a personal relationship with Defendants, pursuant to paragraph 13 of the Decree. Such daily fine shall continue until John Klosterman has made a proposal that complies with the requirements of ¶ 13, but should not exceed thirty (30) days absent further Order of this Court;

      ii. $100 per day shall be paid to the United States if, within ten (10) days of this Court's Contempt Order, Defendant John Klosterman has not proposed to the United States Fair Housing Act training for himself and for any employees

and agents pursuant to ¶¶ 22 and 23 of the Decree.  Such daily fine shall continue until Defendant has made a proposal that complies with the requirements of the Decree,[19] but should not exceed thirty (30) days absent further Order of this Court;

iii. $100 per day shall be paid to the United States if, within ten (10) days of this Court's Contempt Order, Defendant John Klosterman has not completed deposits of $15,000.00 into an **escrow** account, with proof of the deposit demonstrated in the manner specified in paragraph 30 of the Decree.  Such daily fine shall continue until Defendant has provided the required verification, but should not exceed thirty (30) days absent further Order of this Court;

iv. $500 per incident shall be paid to the United States as an additional fine if, on any occasion following the Court's entry of a Contempt Order, Defendant John Klosterman engages in property management responsibilities that are specifically prohibited by the terms of the Decree.  The same fine of $500 per incident should be imposed if Defendant communicates with tenants or prospective tenants in violation of the Decree following the Court's entry of a Contempt Order.  However, the fine(s) specified in this paragraph shall not exceed a total of $5,000 absent further Order of this Court, and may be excused upon clear and convincing evidence by John Klosterman that

---

[19]The United States shall review John Klosterman's contention that he cannot comply with the training requirement during his incarceration.  If no training is possible for John Klosterman at this time, the parties shall employ their best efforts to propose a reasonable modification of ¶ 22 for John Klosterman alone, and shall so notify the Court.

communication was required on an emergency basis, such as a condition impacting the ability of a tenant's home;

d.  Within ten (10) days of the date of the Contempt Order, John Klosterman shall be required to provide to the United States a complete list of all rental properties that John and/or Susan Klosterman have owned, leased, managed, or otherwise controlled (directly or indirectly) beginning on October 1, 2020 through the present date.  Said list shall be verified with a declaration made under penalty of perjury pursuant to 28 U.S.C. § 1746 in order to ensure that the United States has a complete list of past and current holdings;

e.  Within ten (10) days of the date of the Contempt Order, Defendant John Klosterman shall provide to the United States a full accounting of incomes and expenses at all properties owned, leased, managed or controlled by Defendants outside of the Receivership since October 1, 2020, including bank records, rent receipts, and receipts for any expenses for the maintenance of the properties which Defendants maintain should be deducted from the calculation of profits.  Following receipt of this information, the United States may, in its discretion, move the Court to require Defendants to pay rental profits into a fund for the Independent Manager's maintenance of the properties, to restore the parties to the position that they would have been in but for Defendants' noncompliance with the Decree, and to ensure that sufficient funds are available for property management going forward;

f.  Within ten (10) days of the date of the Contempt Order, and every ninety (90) days thereafter for the duration of the Decree, Defendant John Klosterman shall

file with this Court a certification affirmatively stating that he has complied with all Decree requirements including but not limited to the additional requirements entered with the Contempt Order;

g.  The requirement for the parties to endeavor in good faith to resolve informally any differences regarding interpretation of and compliance with the Decree, as set forth in ¶ 46 of the October 1, 2020 Decree, shall continue along with all other provisions unless modified by the Contempt Order. Paragraph 46 includes, but is not limited to, resolution of any future defense of impossibility of performance.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,                          Case No. 1:18-cv-194

     Plaintiff, and                                      Barrett, J.
                                                   Bowman, M.J.

HOUSING OPPORTUNITIES
MADE EQUAL INC.,

     Plaintiff-Intervenor,

        v.

JOHN KLOSTERMAN and
SUSAN KLOSTERMAN,

     Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).